Bernard B. LEVY et al., Plaintiffs,

v.

Honorable Mrs. Mary Evelyn PARKER,
Treasurer of the State of Louisiana,
et al., Defendants.

Civ. A. No. 70–243.

United States District Court,
E. D. Louisiana,
Baton Rouge Division.

June 28, 1972.

Blake G. Arata, Beuker F. Amann, Ernest L. Salatich, David S. Cressy, J. B. Kiefer, New Orleans, La., for plaintiffs.

William Guste, Atty. Gen. of La., Thomas W. McFerrin, Melvin L. Bellar, Kenneth C. DeJean, Asst. Attys. Gen., for defendants.

Before WISDOM, Circuit Judge, and WEST and RUBIN, District Judges.

RUBIN, District Judge.

This taxpayer suit asserts the unconstitutionality of a Louisiana statute and of provisions of the Louisiana constitution that, in conjunction with the assessment practices of Louisiana officials, regulate the distribution of state funds to the various Louisiana parishes for the purpose of reimbursing those parishes for revenues lost as a result of the state

exemption of homesteads from ad valorem taxation. The petitioners contend that the distribution with respect to taxpayers owning homes and paying income and alcoholic beverage taxes in Orleans parish is unequal compared to that made with respect to taxpayers owning like property and paying like taxes in other parishes, that the inequality of appropriation lacks any rational basis, and hence denies the plaintiffs equal protection and due process of law. The plaintiffs, suing not only as homeowners but also as taxpayers contributing to the Property Tax Relief Fund from which appropriations are made, seek a declaratory judgment and, in addition, an injunction to prevent the distribution of disproportionately greater sums to those parishes allegedly receiving them.

The suit does not seek to enjoin the assessment or collection of any state tax. It assumes the constitutionality and validity of the Louisiana Homestead Exemption, La.Const. Art. X, § 4, ¶ 9, relieving homes from a portion of the burden of ad valorem property taxes. The challenge relates solely to the Louisiana constitutional provisions, statutes and practices that determine the manner of distributing state funds. Jurisdiction of this suit is conferred by the Civil Rights Act. 28 U.S.C. § 1343(3).

It has been abundantly demonstrated that Louisiana's present plan for distributing the Property Tax Relief Fund denies the plaintiffs the equal protection of the laws. Therefore, we declare unconstitutional the formula by which the state presently disburses PTR funds. Because the plaintiffs are entitled to relief under the Equal Protection Clause, we do not consider the alleged lack of due process.

## I. FACTUAL BACKGROUND

The suit arises out of a pattern that has developed over a period of 37 years. During the depression of the thirties the ad valorem property tax imposed hardship on property owners, and unemployed working men who owned their own homes were in a particularly serious predicament: unable to find jobs, they could not even raise money to pay property taxes. Many had lost their homes at tax sales, and many more faced this threat.

Pursuant to proposals made by Governor Huey P. Long, the Louisiana Constitution was amended to provide an exemption from state, parish and special ad valorem property taxes for the bona fide homestead of each head of a family, up to an assessment of $2,000. The amendment authorized the legislature to create a fund (the Property Tax Relief Fund) with revenues derived from other state taxes, and to use this fund to reimburse the parochial governments for the sums they lost by reason of the homestead exemption. In 1946 an additional Constitutional Amendment, La. Const. Art. X, § 4, ¶ 9(b), increased the exemption for veterans of World War II to $5,000. The same benefits were later accorded veterans of the Korean War.

At the same time that it proposed the constitutional amendment, the legislature created the PTR Fund, La. Act 54 of 1934, now LSA–R.S. 39:251 et seq., so that the constitutional amendment would be implemented immediately upon its ratification by the voters. The money in the PTR Fund was derived from three taxes: (1) the state income tax, La. Act 21 of 1934, now LSA–R.S. 47:-21; (2) the public utility tax, La. Act 13 of 1934, LSA–R.S. 47:1001; and (3) the alcoholic beverage tax, La. Act 15 of 1934, LSA–R.S. 26:241.

Thus, Louisiana adopted a plan of revenue sharing whereby the state collected income and excise taxes at uniform statewide rates and used them to assist local governments. The constitutional provision and the implementing legislation purported to base the measure of revenue sharing on the amount of revenue each local government unit lost by virtue of the homestead exemption.

The Parish of Orleans and the City of New Orleans were treated differently from other local government units in one significant regard: since that City

and Parish were coterminous, the reimbursement to Orleans was for losses from both city and parish ad valorem taxes.

There are constitutional or statutory limitations on the total taxes that may be levied by each local government body. The limitations with respect to the Parish of Orleans and the City of New Orleans are set by the Louisiana Constitution. The total millage that may be collected by that City and Parish and any governmental agency providing direct service to it is 40.5 mills.[1] In all other parishes, while the general alimony and other general parochial taxes are limited, the tax rate on particular properties can be increased considerably by creating special districts for special governmental purposes, such as schools, roads, drainage, or sewerage. Thus the tax rate is not uniform parishwide in any of Louisiana's other 63 parishes, but a fair idea of the differing parochial rate structures can be gained by examining data compiled in a report made by the nonpartisan Louisiana Public Affairs Research Council, Property Tax Inequities, October, 1971, p. 12, which was received as evidence, pursuant to stipulation. This study shows rates in representative districts in four other parishes to be as follows:

| | |
|---|---|
| Caddo | 42 mills |
| East Baton Rouge | 49 mills |
| Jefferson | 109 mills |
| Rapides | 87 mills |

Because the existing tax rates in each parish were unequal when the PTR Fund was created, the amount of reimbursement to each parish was unequal. But each parish could substantially eliminate these differences because it had the right to levy new taxes, and, in actual practice, to increase the ratio of assessment to fair market value, thus increasing its reimbursement from the PTR Fund. As time passed, the inequities were, however, magnified rather than reduced because some parishes with already high tax rates created even more special districts and imposed even higher tax burdens while, at the same time, manipulating assessments on homestead properties.

To prevent further aggravation of the situation, the Louisiana Legislature adopted Act 465 of 1956, which limited use of the PTR Fund to reimbursement for revenues lost by virtue of the exemption of property from taxes authorized on a parishwide basis, taxes on a district basis for certain restricted purposes, and to other taxes only if they had been authorized prior to the effective date of that statute, August 1, 1956. Other limitations were placed on the kinds of taxes enacted after the statute became effective that would be eligible for reimbursement from the Fund.

Inequality exists not only with respect to tax rates. As everyone knows and the state readily admits, property is assessed on different standards in the various parishes.

Louisiana does not have an effective statewide assessment procedure. Property is assessed by parochially elected assessors (save in New Orleans where

1. As to the City of New Orleans, the taxing authority is limited as follows:

| Tax | Constitutional or Statutory Provision | Maximum Rate |
|---|---|---|
| City general alimony tax, Art. XXIV, § 24 and § 25.1 | | 7 mills |
| City bond redemption, Act 110 of 1890 | | 10 mills |
| Sewage & Water Board, Art. XXIV, § 23.1 | | 2 mills |
| Sewage & Water Board, Art. XXIV, § 23.2 | | 3 mills |
| Police and Fire, Art. XXIV, § 25 | | 2 mills |
| School Board, Art. XII, § 16 | | 13 mills |
| Levee Board, Act 4, 1916, as amended, Act 575 of 1966: Art. XIV, § 24 | | 2½ mills |
| Police & Fire, Art. XXIV, § 25 | | 1 mill |
| | Total | 40.5 mills |

assessors are elected by districts). There is some review by the Louisiana State Tax Commission, La.Const. Art. X, § 2, La.R.S. 47:1988–90, of the assessment of other types of property but there appears to be no real effort to equalize local assessments of homesteads.

Thus, although Louisiana law requires property to be assessed at its actual cash value, La.R.S. 47:1957, the departure of practice from law is demonstrated by the PAR Study. It revealed that in 1970 parishwide average assessments ranged from 5.7% of market value to 24.5% of market value.[2]

The homestead exemption program disposes some assessors to assess all homes at approximately the exemption level, be it $2,000 or $5,000, thus creating a high assessment ratio for low priced homes and a lower assessment ratio for high priced homes. Once homeowners in a given parish are satisfied that few homes will be assessed at much above the exemption level, there is a further impetus for the locality to impose a high millage rate because these property taxes will be substantially subsidized by the state at little or no cost to the homeowner.

The combined action of these factors produces an inequitable distribution of state funds. In Jefferson Parish in 1969 urban residential property was assessed on the average at 8.1% of its retail sale value, and the parish as a whole had only 6.4% of the state's total residential assessments. But it received 17.3% of the total PTR Fund in that year. Caddo Parish, with a residential assessment ratio of 25.3%, received only 7.9% of the PTR Fund.

The 1956 statute reduced the likelihood of the creation of further disparities, but it also prevented the parishes that had not created certain types of special tax districts from doing so.

The result of the pattern thus created is that the PTR Fund reimburses Orleans Parish by paying it $96.67 per homestead exemption while, for each such exemption, it pays Jefferson Parish $179.76, East Feliciana $35.15, and St. Bernard Parish $198.20. The distribution to these four parishes illustrates an inequality that applies to almost every parish.

## II. LEGAL PRINCIPLES

■■■ There are no precedents applying the guarantee of equal protection to state revenue sharing plans. But the proscription of discriminatory state action is sweeping in its terms: "No State . . . shall deny to any person within its jurisdiction the equal protection of the laws." The clause reaches the exercise of state power, however manifested, whether exerted directly or through political subdivisions. Avery v. Midland County, 1968, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45. It forbids not only designed discrimination but all government action that has arbitrary impact even though the result may not originally have been intended by the governmental plan. Norwalk CORE v. Norwalk Redevelopment Agency, 2 Cir. 1968, 395 F.2d 920.

■■ The presumption of reasonableness is of course with the state. Metropolitan Casualty Ins. Co. v. Brownell, 1935, 294 U.S. 580, 584, 55 S.Ct. 538, 540, 79 L.Ed. 1070. Unless it can be shown that the state's failure to treat all alike has no rational basis, the state's action must be sustained. Id., McGowan v. Maryland, 1961, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393. (We leave to one side situations involving a state restriction on the exercise of a constitutional right; and the requirement that, in such cases, the state must show a compelling interest to justify its action. Shapiro v.

---

2. Within the parishes themselves the range of assessments was from 1.0% of actual value to 550.0% in Red River Parish, and from 0.8 to 14.6% in Allen Parish. This resulted in part from the fact that, within the parishes themselves, improved urban real estate and homesteads less valuable are both usually assessed at a higher proportion of market value than is rural or unimproved property.

Thompson, 1969, 394 U.S. 618, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600.)

■ Fifty years ago, in holding valid another early type of state revenue sharing, the Supreme Court, in Dane v. Jackson, 1921, 256 U.S. 589, 599, 41 S.Ct. 566, 568, 65 L.Ed. 1107, said:

> [A] state tax law will be held to conflict with the Fourteenth Amendment only where it proposes, or clearly results in, such flagrant and palpable inequality between the burden imposed and the benefit received, as to amount to the arbitrary taking of property without compensation—'to spoliation under the guise of exerting the power of taxing.'

A system of state taxation is valid if there is "any conceivable state of facts which would support it." Carmichael v. Southern Coal & Coke Co., 1937, 301 U.S. 495, 509, 57 S.Ct. 868, 872, 81 L.Ed. 1245.

■■ "The Equal Protection Clause relates to equality between persons as such rather than between areas." Salsburg v. State of Maryland, 1953, 346 U.S. 545, 74 S.Ct. 280, 98 L.Ed. 281. It does not mandate geographic uniformity. Thus, it has been held that a state may prescribe one rule of law for one urban county or parish and another for the rest of the state. See Missouri v. Lewis, 1879, 101 U.S. 22, 31, 25 L.Ed. 989. See also Griffin v. County School Board of Prince Edward County, 1964, 377 U.S. 218, 230, 84 S.Ct. 1226, 12 L.Ed. 2d 256.

■ If, however, arbitrary discrimination is demonstrated, the mandate of the Equal Protection Clause is applicable without regard to the manner by which the discrimination is achieved or the nature of the interest affected. Thus the Equal Protection Clause has been applied to state action dealing with aliens,[3] birth control,[4] crimes,[5] failure to provide equal municipal services,[6] housing and rent acts,[7] illegitimates,[8] insanity,[9] minors,[10] revenue payments,[11] sex,[12] sterilization,[13] voting rights,[14] and welfare payments.[15]

"While distinctions based on geographical areas are not, in and of themselves, violative of the Fourteenth Amendment, . . ., a state must demonstrate, if it wishes to establish different classes of property [for tax purposes] based upon different geographical localities—e. g., rural areas as opposed to urban areas—that the classification is neither capricious nor arbitrary but rests upon some reasonable consideration of difference or policy. State Board of Tax Comm'rs of Indiana v. Jackson, 283 U.S. 527, 537, 51 S.Ct. 540, 75 L.Ed. 1248 (1931)." Weissinger v. Boswell, M.D.Ala.1971, 330 F.Supp.

---

3. Graham v. Richardson, 1971, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534.

4. Eisenstadt v. Baird, 1972, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274.

5. Tate v. Short, 1971, 401 U.S. 395, 91 S. Ct. 668, 28 L.Ed.2d 130; Mayer v. City of Chicago, 1971, 404 U.S. 189, 92 S.Ct. 410, 30 L.Ed.2d 372; Roberts v. LaVallee, 1967, 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed. 2d 41.

6. Hawkins v. Town of Shaw, 5 Cir. 1971, 437 F.2d 1286.

7. Reitman v. Mulkey, 1967, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830.

8. Levy v. Louisiana, 1968, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436.

9. Specht v. Patterson, 1967, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326.

10. In re Gault, 1967, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527.

11. Cipriano v. City of Houma, 1969, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647; City of Phoenix v. Kolodziejski, 1970, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523.

12. Reed v. Reed, 1971, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225.

13. Skinner v. Oklahoma, 1942, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655.

14. Williams v. Rhodes, 1968, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, Hadley v. Jr. College Dist. of Metro. Kansas, 1967, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45.

15. Shapiro v. Thompson, 1969, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600; Sailer v. Leger, 1971, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534.

615; compare Griffin v. County School Board of Prince Edward County, *supra.*

 The Equal Protection Clause, therefore, reaches all state actions. Cooper v. Aaron, 1958, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19. It assures equality not only in the imposition but also in the distribution of state revenues. Hess v. Mullaney, 1954, 213 F.2d 635, 15 Alaska 40. Even largesse must be dispensed with an even hand. Shapiro v. Thompson, 1969, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600. Tax relief funds, designed to assist localities by making funds raised by state taxes available to local governmental agencies, must be administered by statute and in practice so as to avoid that governmental favoritism to one person over another that the Fourteenth Amendment was designed to proscribe. The failure to accord equal protection to all persons may not be justified by the sophistry that the receipt of funds from the legislature is a "privilege" and not a "right." See Sherbert v. Verner, 1963, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965.

## III. WHEREIN THE DENIAL OF EQUAL PROTECTION LIES

The purpose of the PTR Fund, when enacted, was to reimburse local governmental authorities for tax revenues they would have collected but for the existence of the Louisiana homestead exemption. Were statewide assessment on an equal basis the rule, it would be accurate to assume that a state law exempting homesteads would cause a parish to lose revenue equal to its millage multiplied by the amount of assessed value of the homestead exempt from taxation. In such a situation, the state would merely be repaying what it had caused each parish to lose by enacting the homestead exemption.

Before the enactment of the PTR Fund legislation, the vagaries of local tax practices were largely a matter of local concern; a parish that assessed properties at a low ratio of value merely affected its own revenues and the amount that the state collected on the state ad valorem tax. After creation of the PTR Fund, the fact that state taxes were levied on the same assessment was of even less concern to local homeowners so long as the state's own homestead exemption applied. However, the redistribution of state revenues through the PTR Fund, based only on the actual homestead assessment in each parish multiplied by that parish's millage rate, magnified the importance of the varying level of assessment from parish to parish in determining what each received from the state.

It was possible to increase the parish share of PTR Fund payments, without simultaneously increasing the tax burden on local homeowners, by raising the millage rate on all property while lowering the assessments on property not occupied as a homestead and raising the assessments of homesteads to approach the allowable homestead exemption. The evidence indicates that this was in fact done.

The millage rate in a parish does not now necessarily reflect the severity of that locality's tax burden. At least in some parishes it reflects the degree to which the local authorities have manipulated the several variables determining the tax burden imposed on its residents. The millage-times-assessment-any-basis-you-choose formula for distributing state funds is, in a word, arbitrary. It establishes a rule for distributing state funds that is no rule at all.

The state did nothing to prevent this until 1956. When it acted then, it did not relieve inequality. Instead it became further responsible for the disparate treatment of the residents of different parishes by imposing limitations on the ability of those parishes in a less favorable position to improve their situation.

No reason has been advanced, nor any governmental policy argued, that would support the reimbursement of each Louisiana parish on the basis now in effect. It has not been suggested that the amounts now being paid to any parish

are based on its real loss of revenue resulting from the homestead exemption, or on state policy based on any rational geographical or demographic classification, or on any other basis that might constitute coherent governmental policy. Louisiana's appropriations from its PTR Fund are based on no discernible attempt either to classify parishes or even to deal with them on an ad hoc basis one by one.

Louisiana's pattern denies to the homestead owners in Orleans Parish and to those who there pay taxes on income and on alcoholic beverages the same treatment the state accords to similarly situated taxpayers and homestead owners in other parishes; the pattern thus affects adversely the benefits Orleans' parochial and municipal government can afford these citizens. The taxpayers thus discriminated against have standing to sue. Fuller v. Volk, 3 Cir. 1965, 351 F.2d 323; Poindexter v. Louisiana Financial Assistance Com., D.C.La.1966, 258 F.Supp. 158; Reynolds v. Wade, 1957, 249 F.2d 73, 17 Alaska 401. See also Everson v. Board of Education, 1947, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711. Compare the cases concerning the standing of federal taxpayers to challenge federal appropriations. Frothingham v. Mellon, 1923, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078; Flast v. Cohen, 1968, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947. The Louisiana courts have recognized the standing of a Louisiana taxpayer to challenge a state appropriation or expenditure on the basis that it is unconstitutional. Carso v. Board of Liquidation, 1944, 205 La. 368, 17 So.2d 358; Graham v. Jones, 1941, 198 La. 507, 3 So.2d 761. See also Parish of Jefferson v. La. Dept. of Corrections, 1971, 259 La. 1063, 254 So.2d 582, Justice Tate concurring.

We express no opinion concerning the validity of a legislative plan basing appropriations on standards employing geographic, population, or other systematic classifications. It should be unnecessary to distinguish the inequality arising in this situation from the disparity that might result from annual or biennial legislative appropriations to local areas. Such appropriations are not based on a continuing formula. The legislature perforce reviews its action with each appropriation; further, appropriations generally do not continue in effect from one session to another. Those entities receiving less can make a special legislative appeal, and they are afforded access to the legislative process every session to seek change.

In the area now under challenge, the cumulative thrust of Louisiana's trident of constitution, statute and practice imposes and preserves inequality. The fact that the 1956 statute can be repealed does not shield the present pattern of inequality; every unconstitutional law can be repealed and every unconstitutional state practice altered by state action. When a state's existing law or practice is properly challenged, it is the duty of the federal courts to measure that action against the Fourteenth Amendment.

Louisiana's practice is not a matter of variation in state taxation, the manner by which the state raises its funds. The discrimination lies in the arbitrary inequality of the distribution of state funds. 28 U.S.C. § 1341 is inapplicable here because the suit does not seek to enjoin the collection of taxes; it challenges only the unequal distribution of state funds. Nor is the question merely how assessments are made; adequate remedy to challenge assessment procedure is available in state courts. Bussie v. Long, 5 Cir. 1967, 383 F.2d 766. Assessment practices contribute to the inequality but they do not alone create it. Were Louisiana to equalize all assessments statewide tomorrow, the discrimination would merely be reduced, not eliminated.

The PTR Fund discrimination against Orleans Parish results from the interaction between a wholly arbitrary—albeit not on its face discriminatory—method of distributing state funds, and other state policies that may be based on solid constitutional foundation.

We consider here only the combination of unequal assessments, limitations on the taxing power of a local government, and facially non-discriminatory payment of state revenues to localities based upon prevailing local millage rates, and we conclude that this scheme of payment is constitutionally infirm as it is applied in fact. We do not rule today upon the validity of the 1956 Act or the 40.5 mill limitation upon the Parish of Orleans when either of those measures is viewed in isolation. There are many formulas that the state may adopt to provide a rational basis for distributing PTR Funds. It is for the Legislature of Louisiana to determine what Louisiana's policy should be. If the program it adopts should require amendment of Louisiana's constitution, it is for the legislature to propose such amendments as may be necessary, for submission to Louisiana's voters. Federal courts may, and should, intervene only if the state violates the federal constitution.

■■■■ For these reasons this court declares unconstitutional the use of a formula for distributions from the PTR Fund based upon millage while the conditions stipulated by the parties and the 1956 statute prevail.

The scheduled payments from the PTR Fund for October 15, 1972 are enjoined. The defendants are to submit to the court by September 1, 1972 a PTR Fund distribution plan that will not violate the Equal Protection Clause.

The decision in this case will apply only prospectively. Of course it will not affect the validity of any securities that may have been sold or issued prior to this decision. The parties will consider this in connection with the proposed distribution plan.

When submitted, the plan will be noticed for hearing at an appropriate date.

E. Gordon West, J., dissents, for reasons set forth in dissenting opinion.

E. GORDON WEST, District Judge (dissenting):

The majority opinion concludes that the manner in which the State of Louisi-ana distributes the money in its Property Tax Relief Fund to its political subdivisions (parishes) violates the equal protection clause of the Fourteenth Amendment to the United States Constitution. I disagree, for the specific reason that I do not believe the State of Louisiana is governed by the Fourteenth Amendment in the manner in which it distributes funds to its political subdivisions. It must be remembered that none of the money in question is distributed to individuals. All individuals in the State are treated equally insofar as receiving the $2,000 or $5,000 homestead exemption is concerned. No one contests this fact. But when the State reimburses the political subdivisions (not the individuals) for the income the parish has lost because of the homestead exemption pursuant to a formula duly passed and approved by the Louisiana Legislature, the majority opinion concludes that somehow the equal protection clause of the Fourteenth Amendment has been violated. It is interesting to note that the majority opinion does not conclude that the Louisiana constitutional limitation on the taxing power of Orleans Parish is unconstitutional, nor does it conclude that the legislative formula by which the funds are disbursed is necessarily unconstitutional. It simply says that the "scheme of payment is constitutionally infirm as it is applied in fact." But the majority cites no authority in law for saddling the State with the equal protection clause of the Fourteenth Amendment when it distributes funds to its political subdivisions. Indeed they cite ample authority to the contrary. For example, the majority opinion cites the case of Hess v. Mullaney, 213 F.2d 635, 15 Alaska 40 (1954) as authority for their statement that "it [the Fourteenth Amendment] assures equality not only in the imposition but also in the distribution of state revenues." But *Hess* was dealing with tax levies assessed against individuals at different rates according to whether they lived inside or outside of certain municipalities. The

Court, in fact, upheld that taxing procedure and said:

"It is not unusual for states after collecting taxes on a state-wide basis to make distribution of revenues to municipal corporations, particularly in the case of school districts. No requirements of uniformity or of equal protection of the law limit the power of a legislature in respect to allocation and distribution of public funds." (See Gen. Amer. Tank Car Corp. v. Day, 270 U.S. 367, 372, 46 S.Ct. 234, 70 L.Ed. 635; Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 521, 522, 57 S.Ct. 868, 81 L.Ed. 1245.)

The majority opinion next cites State Board of Tax Commissioners of Indiana v. Jackson, 283 U.S. 527, 51 S.Ct. 540, 75 L.Ed. 1248. But in that case, the Supreme Court said:

"The principles which govern the decision of this cause are well settled. The power of taxation is fundamental to the very existence of the government of the states. The restriction that it shall not be so exercised as to deny to any the equal protection of the laws does not compel the adoption of an iron rule of equal taxation, nor prevent variety or differences in taxation, or discretion in the selection of subjects, or the classification for taxation of properties, businesses, trades, callings, or occupations. * * * The fact that a statute discriminates in favor of a certain class does not make it arbitrary, if the discrimination is founded upon a reasonable distinction, * * * or if any state of facts reasonably can be conceived to sustain it. * * * As was said in Brown-Forman Co. v. Kentucky, supra, at page 573 of 217 U.S. [563], 30 S.Ct. 578, 580 [, 54 L.Ed. 883]:

" 'A very wide discretion must be conceded to the legislative power of the state in the classification of trades, callings, businesses, or occupations which may be subjected to special forms of regulation or taxation through an excise or license tax. If the selection or classification is

neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of equal protection of the law.' "

Certainly there was nothing before the Court in this case to show that the formula by which the funds are distributed is either capricious or arbitrary, and there was certainly nothing to show that the State in any way abused its "very wide discretion."

And in Salsburg v. State of Maryland, 346 U.S. 545, 74 S.Ct. 280, 98 L.Ed. 281, as stated in the majority opinion, the Supreme Court of the United States said:

"The Equal Protection Clause relates to equality between *persons as such* rather than between areas." (Emphasis added.)

Also, in Missouri (Bowman) v. Lewis, 101 U.S. 22, 25 L.Ed. 989, the Supreme Court, recognizing the fact that the Fourteenth Amendment does not require equal protection as between geographical areas, said:

"The 14th Amendment does not profess to secure to all persons in the United States the benefit of the same laws and the same remedies. Great diversities in these respects may exist in two States separated only by an imaginary line. On one side of this line there may be a right of trial by jury, and on the other side no such right. Each State prescribes its own modes of judicial proceeding. If diversities of laws and judicial proceedings may exist in the several States without violating the equality clause of the 14th Amendment, there is no solid reason why there may not be such diversities in different parts of the same State. A uniformity which is not essential as regards different States cannot be essential as regards different parts of a State, * * * * "

The majority opinion does not cite a single case wherein it was held that the equal protection clause of the Fourteenth Amendment was applicable to a situation even remotely the same as that involved

here. The cases they cite simply have no application to a situation involving distribution of funds by a state to its political subdivisions as distinguished from a distribution to individuals. For example, the case of Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45, cited in the majority opinion, involved reapportionment where the thing at issue was the power of each individual's vote. Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (CA 2–1968), deals with an urban renewal project—involving individual rights. But even in that case the Court said:

> "The courts will not, it is clear, entertain a suit by one who does not have some personal stake in the outcome of the litigation."

The Court, in *Norwalk*, then cited Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078, wherein the Supreme Court refused to allow a taxpayer to challenge the constitutionality of a statute where plaintiff's claimed interest in the outcome was simply that "the effect of the appropriation complained of will be to increase the burden of future taxation and thereby take her property without due process of law." The burden of future taxation was held to be essentially a matter of public not individual concern.

The majority opinion states that the equal protection clause reaches all state action and then cites several cases in support of that assertion. But that assertion is not correct, and it is not supported by the cited cases. Every case cited deals with action of the state aimed directly at individuals. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, dealt with integration of public schools and simply said that where individual agents of the state acted, their actions would be considered state action. It had nothing to do with whether or not action by the state in connection with its political subdivisions, as distinguished from actions directed only at individuals, was subject to proscription of the Fourteenth Amendment. The majority opinion then states that "Even largesse must

be dispensed with an even hand" and they cite Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600, as authority. But *Shapiro* dealt only with the question of dispensing welfare directly to individuals. It had nothing to do with the distribution of funds by a state to its political subdivisions. Finally, the majority says that "the failure to accord equal protection to all persons may not be justified by the sophistry that the receipt of funds from the legislature is a 'privilege' and not a 'right.'" And they cite Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965. But *Sherbert* dealt with the individual right to religious belief, and did not address itself to the question of whether or not a state is constitutionally required to distribute funds equally to all of its political subdivisions.

The majority simply begins with the assumption that if one parish somehow ends up with a larger share of the Property Tax Relief Fund than another parish, there is bound to be something constitutionally wrong, and then they proceed to bend and twist the jurisprudence to fit the conclusion that a Fourteenth Amendment prohibition has been violated. It seems to me that it would be more logical, more equitable, and more legally correct to simply cite the Tenth Amendment to the United States Constitution, which says:

> "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people"

and then conclude, as you must after an examination of the jurisprudence, that no where has the Federal Government nor the Federal Courts been given the authority to dictate to the States how they will distribute their tax resources among their various political subdivisions. On the contrary, a fair conclusion would be that the law and the jurisprudence require exactly the opposite. The Louisiana Legislature meets every year. Under current apportionment the people are represented as nearly as possible on a one man one vote basis. The

question of distribution of state funds to the parishes may be brought up for review and change whenever the duly elected representatives of the people wish to do so. The matter of distribution of state funds to political subdivisions is simply one for the states to resolve as they see fit and not a matter to be interfered with by the Federal Courts.

And finally, I must note that the majority is not satisfied with holding the present plan of distribution invalid. They now take it upon themselves to order the state to submit a plan for distribution of the funds in the Property Tax Relief Fund for approval by this Court. I suggest that even if the Court finds the present plan of distribution to be invalid, it has no right to do anything but so hold. It has no authority in law to order the defendants to prepare or submit any plan whatsoever. At most it can enjoin the defendants from using the present plan and that is all.

For these reasons I respectfully dissent and would hold that there is no constitutional infirmity in the present plan of distribution of the Louisiana Property Tax Relief Fund.